## ASSET PURCHASE AGREEMENT

between

### GENESIS NETWORKS TELECOM SERVICES, LLC
a Texas limited liability company,

and

### ENDEAVOR MANAGED SYSTEMS, INC.
a Delaware corporation

—————————————————————

Effective as of May 31, 2022

—————————————————————

EMS_002079

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is entered into as of May 31, 2022, by and between GENESIS NETWORKS TELECOM SERVICES, LLC, a Texas limited liability company, (the "Seller") and Endeavor Managed Systems, Inc., a Delaware corporation (the "Purchaser"). Certain capitalized terms used in this Agreement are defined in Exhibit A.

## RECITALS

The Seller and the Purchaser wish to provide for the sale of the Transferred Assets (as defined in Section 1.1) to the Purchaser and the assumption of the Assumed Liabilities (as defined in Section 1.4) by Purchaser on the terms set forth in this Agreement.

## AGREEMENT

The parties to this Agreement, intending to be legally bound, agree as follows:

1.    **SALE OF TRANSFERRED ASSETS; RELATED TRANSACTIONS.**

    **1.1    Sale of Transferred Assets.** Upon the terms and subject to the conditions set forth in this Agreement, upon the Closing (as defined in Section 1.6), the Seller shall sell, assign, transfer, convey and deliver to the Purchaser, and the Purchaser shall purchase from the Seller, good and valid title to the Transferred Assets. For purposes of this Agreement, the term "Transferred Assets" shall mean the properties, rights, interests and tangible and intangible assets of the Seller relating to the Business (as defined herein) described below in Sections 1.1(a) – 1.1(i) (wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP), whether existing as of the date of this Agreement or acquired during the Pre-Closing Period and whether owned by the Seller, which shall not include any Excluded Assets (as defined in Section 1.1(j)):

        **(a)**    Patents and Patent Applications. All right, title and interest of the Seller in, to and under the Seller's patents, patent applications and patent rights in any jurisdiction in the world, including without limitation those identified on Schedule 1.1(a), and any counterparts, reissues, divisions, reexaminations, continuations and continuations-in-part of, and any other patents claiming priority from, any of the foregoing (the patents, patent applications and patent rights referred to in this Section 1.1(a) being referred to in this Agreement as the "Transferred Patents").

        **(b)**    Other Proprietary and IP Assets. All right, title and interest of the Seller in, to and under the trademarks, trade secrets, know-how, inventions, designs, drawings, copyrights, internally developed/proprietary software, bills of material and related supply chain information, and other Intellectual Property and Intellectual Property Rights (other than patent rights) of the Seller relating exclusively to the Business, including without limitation works in progress and the trademarks identified on Schedule1.1(b), and all associated goodwill (the Transferred Patents, together with the Intellectual Property and Intellectual Property Rights and goodwill referred to in this Section1.1(b), being referred to in this Agreement as the "Transferred IP").

        **(c)**    Inventory. All of the inventory (including raw materials, work in process, demonstration or evaluation units and finished goods) of the Seller relating to the Business, including

EMS_002080

without limitation those identified on Schedule 1.1(c) (the inventory referred to in this Section 1.1(c) being referred to in this Agreement as the "Transferred Inventory").

        **(d)**    Equipment.  All equipment of the Seller relating to the Business, including without limitation equipment identified on Schedule 1.1(d) (the equipment referred to in this Section 1.1(d) being referred to in this Agreement as the "Transferred Equipment").

        **(e)**    Other Fixed Assets. All furniture, fixtures, computer equipment and other tangible assets of the Seller relating to the Business, including without limitation those identified on Schedule 1.1(e) (the tangible assets referred to in this Section 1.1(e) being referred to in this Agreement as the "Transferred Fixed Assets").

        **(f)**    Contract Rights. (i) All rights of the Seller under all Seller Contracts relating to the Business and identified on Schedule 1.1(f).

        **(g)**    Governmental Authorizations and Certifications from Standards Bodies.  All Governmental Authorizations and Certifications from Standards Bodies of the Seller relating to the Business, including without limitation those identified on Schedule 1.1(g).

        **(h)**    Claims.  All Claims (including Claims for past infringement of Transferred IP) of the Seller against other Persons to the extent relating to the Transferred Assets (regardless of whether or not such Claims have been asserted by the Seller), and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery possessed by the Seller against other Persons to the extent relating to the Transferred Assets (regardless of whether such rights are currently exercisable).

        **(i)**    Promotional Materials, Records, Etc..  All advertising and promotional materials, and all books (including log books), records and files, of the Seller relating exclusively to the Transferred Assets and identified on Schedule 1.1(i) (the books, records and other items referred to in this Section 1.1(i) being referred to in this Agreement as the "Transferred Books").

        **(j)**    Excluded Assets.  Notwithstanding the foregoing, the parties agree that the Seller is not selling, assigning, transferring, conveying or delivering to the Purchaser or a Purchaser Affiliate, and the Transferred Assets shall not include, the assets of the Seller identified on Schedule 1.1(j) (collectively, the "Excluded Assets").

    **1.2**    **Agreements Relating to Transfer of Transferred Assets.**

        **(a)**    Electronic Delivery. At the request of the Purchaser, any of the Transferred Assets (including software and any related documentation) that can be transmitted electronically will be so transmitted to the Purchaser promptly following the Closing and will not be delivered to the Purchaser on any tangible medium.  Promptly following any electronic transmission, the Seller shall execute and deliver to the Purchaser a certificate in a form reasonably acceptable to the Purchaser and containing, at a minimum, the following information: (i) the date of transmission; (ii) the time the transmission was commenced and concluded; (iii) the name of the individual who made the transmission; (iv) the signature of such individual; and (v) a general description of the nature of the items transmitted sufficient to distinguish the transmission from other transmissions.

        **(b)**    Physical Delivery. Unless otherwise requested by Purchaser, any and all Transferred Inventory, Transferred Equipment, Transferred Fixed Assets and Transferred Books to the

EMS_002081

Purchaser (the "Tangible Transferred Assets") shall remain where it is physically located as of the Closing Date (defined below).

**1.3    Purchase Price.**  As consideration for the sale, assignment, transfer, conveyance and delivery of the Transferred Assets to the Purchaser, and in full payment therefore:

**(a)**    The Purchaser will assume the Assumed Indebtedness (the "Purchase Price") at the Closing; and

**(b)**    At the Closing, the Purchaser shall assume the Assumed Liabilities (as defined in Section 1.4(b)).

**1.4    Assumption of Liabilities.**

**(a)**    Except as set forth in Section 1.4(b) and/or listed on Schedule 1.4(b), the Purchaser shall not assume any Liabilities of the Seller (whether or not related to the Transferred Assets), including, but not limited to: (i) Tax Liabilities of the Seller; (ii) any Liabilities of the Seller relating to indebtedness, legal services, accounting services, financial advisory services, investment banking services or other professional services performed in connection with the Transactions; or (iii) any wages or salaries or other Liabilities relating to any Seller Employee, including any Retained Employment Liabilities (as defined in Section 5.1) (all of which is referred to herein as "Excluded Liabilities" as set forth on Schedule 1.4(c)).

**(b)**    Assumed Liabilities: "Assumed Liabilities" shall include the liabilities of the Seller relating to the Business or the Transferred Assets identified and described on Schedule 1.4(b) existing on the Closing Date, regardless of whether or not such liabilities would be required to be included on the Seller's financial statements in accordance with GAAP.

**1.5    Allocation.**  Within sixty (60) days of the Closing Date (as defined in Section 1.6), the Purchase Price (and the Assumed Liabilities to the extent properly taken into account) shall be allocated to the Transferred Assets within a Schedule to be attached as Schedule 1.5 hereto, which shall be prepared in accordance with Section 1060 of the Code, and the Treasury Regulations promulgated thereunder. The allocation set forth on Schedule 1.5 hereto (and any amendments thereto) shall be binding upon the parties and none of the parties shall take any position inconsistent with such allocation, and any and all filings with and reports made to any taxing authority will be consistent with that allocation.

**1.6    Closing.**  Subject to the terms and conditions of this Agreement, the closing of the sale of the Transferred Assets pursuant to this Agreement (the "Closing") shall take place electronically at a time to be agreed upon by the Purchaser and the Seller, on a date to be agreed upon by the Purchaser and the Seller.  The date on which the Closing takes place is referred to in this Agreement as the "Closing Date."

**2.    REPRESENTATIONS AND WARRANTIES OF THE SELLER.**

Subject to the exceptions set forth in the Seller Disclosure Schedule prepared in accordance with Section 6.16, the Seller represents and warrants, to and for the benefit of the Purchaser, as follows:

**2.1    Due Organization; Charter Documents; Etc.**

**(a)**    The Seller has been duly organized and is validly existing and in good standing (or equivalent status), under the laws of the jurisdiction of its formation and has the requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as now being conducted and as presently proposed to be conducted. The Seller is duly qualified to transact business and

EMS_002082

is in good standing in each jurisdiction in which the failure to so qualify would have a Material Adverse Effect on the Seller.

(b)    The Seller has delivered to the Purchaser accurate and complete copies of the Charter Documents.

2.2    **Liabilities.**  Schedule 1.4(b) provides an accurate and complete breakdown of each of the Assumed Liabilities of the Seller.

2.3    **Title to Assets.**  The Seller owns and has good and valid title to the Transferred Assets free and clear of any Encumbrances, except as set forth in Part 2.3 of the Seller Disclosure Schedule.

2.4    **Compliance with Legal Requirements.**  The Seller is, (and each of its Predecessors) at all times has been, in compliance in all material respects with each Legal Requirement that is applicable to it for the conduct of the Business or the ownership of the Transferred Assets.

2.5    **Governmental Authorizations.**  Part 2.5 of the Seller Disclosure Schedule identifies each Governmental Authorization held by the Seller that is necessary for the operation of the Business or maintaining the Transferred Assets, and the Seller has delivered to the Purchaser accurate and complete copies of all Governmental Authorizations identified in Part 2.5 of the Seller Disclosure Schedule.  The Governmental Authorizations identified in Part 2.5 of the Seller Disclosure Schedule are valid and in full force and effect, and collectively constitute all Governmental Authorizations necessary to enable the Seller to lawfully operate the Business.

2.6    **Tax Matters.**  The Seller is not nor has it ever been a United States Real Property Holding Corporation within the meaning of Section 897(c)(2) of the Code.

2.7    **Proceedings; Orders.**

(a)    There is no pending Proceeding, and, to the Seller's knowledge, no Person has threatened to commence any Proceeding: (i) that involves the Seller's operation of the Business or any of the Transferred Assets; or (ii) that challenges, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the Transactions.

(b)    There is no order, writ, injunction, judgment or decree to which the Seller's operation of the Business or any of the Transferred Assets is subject.

2.8    **Authority; Binding Nature of Agreement.**  The Seller has the absolute and unrestricted right, full corporate power and authority to enter into and to perform its obligations under this Agreement and under each other agreement, document or instrument referred to in or contemplated by this Agreement to which the Seller is or will be a party; and, the execution, delivery and performance by the Seller of this Agreement and of each such other agreement, document and instrument have been duly authorized by all requisite corporate action on the part of the Seller and its Members.  This Agreement and each other agreement, document and instrument referred to in or contemplated by this Agreement to which the Seller is a party constitutes the legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, subject to: (i) laws of general application relating to bankruptcy, insolvency and the relief of debtors; and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies.

2.9    **Non-Contravention; Consents.**  Neither: (1) the execution, delivery or performance of this Agreement or any of the other agreements, documents or instruments referred to in this Agreement;

EMS_002083

nor (2) the consummation of the Transactions or any such other agreement, document or instrument, will (with or without notice or lapse of time):

    **(a)**    contravene, conflict with or result in a violation of: (i) any of the provisions of any Charter Documents; or (ii) any resolution adopted by the Members of the Seller;

    **(b)**    contravene, conflict with or result in a violation of any Legal Requirement or any order, writ, injunction, judgment or decree to which the Seller, or any of Transferred Assets, is subject;

    **(c)**    result in the imposition or creation of any lien or other Encumbrance upon or with respect to any Transferred Asset.

Except as set forth in Part 2.9 of the Seller Disclosure Schedule, the Seller is not and the Seller will not be required to make any filing with or give any notice to, or to obtain any Consent from, any Person in connection with: (A) the execution, delivery or performance of this Agreement or any of the other agreements referred to in this Agreement; or (B) the consummation of any of the Transactions.

    **2.10**    **Brokers.**  No broker, finder or investment banker is entitled to any brokerage, finder's or other similar fee or commission in connection with any of the Transactions based upon arrangements made by or on behalf of any of the Seller.

**3.**    **REPRESENTATIONS AND WARRANTIES OF THE PURCHASER.**

    The Purchaser represents and warrants to, and for the benefit of the Seller as follows:

    **3.1**    **Due Organization.** The Purchaser is a corporation, validly existing and in good standing (or equivalent status) under the laws of the jurisdiction of its incorporation and each has the requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as now being conducted and as presently proposed to be conducted. The Purchaser is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a Material Adverse Effect on the Purchaser.

    **3.2**    **Non-Contravention; Consents.**  Neither: (a) the execution, delivery or performance of this Agreement or any of the other Transactional Agreements; nor (b) the consummation of the Transactions, will (with or without notice or lapse of time) contravene, conflict with or result in a violation of: (i) any of the provisions of Purchaser's Charter Documents; (ii) any resolution adopted by the stockholders, the board of directors or any committee of the board of directors of Purchaser; or (iii) any provision of any material contract to which Purchaser is bound. No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any Governmental Body is required on the part of Purchaser in connection with the consummation of the Transactions.

    **3.3**    **Authority; Binding Nature of Agreement.**  Purchaser has all necessary corporate power and authority to enter into and perform its obligations under this Agreement and under each other agreement, document and instrument referred to in this Agreement to which it is a party, and to consummate the transactions contemplated hereby and thereby; and the execution, delivery and performance by Purchaser of this Agreement any of each such other agreement, document and instrument and the consummation by the Purchaser of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of Purchaser and no other actions on the part of Purchaser is necessary to authorize this Agreement any of each such other agreement, document and instrument and the consummation by the Purchaser of the transactions contemplated hereby and thereby. This Agreement and

EMS_002084

each other agreement, document or instrument referred to in this Agreement to which Purchaser is a party constitutes the legal, valid and binding obligation of Purchaser enforceable against it in accordance with its terms, subject to: (a) laws of general application relating to bankruptcy, insolvency and the relief of debtors; and (b) rules of law governing specific performance, injunctive relief and other equitable remedies.

      **3.4    Proceedings; Orders.** There is no pending Proceeding, that challenges, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the Transactions. No event has occurred, and no claim, dispute or other condition or circumstance exists, that will or could reasonably be expected to, give rise to or serve as a basis for the commencement of any such Proceeding.

**4.    CERTAIN COVENANTS.**

      **4.1    Filings and Consents.** The Seller and the Purchaser shall use commercially reasonable efforts to take, or cause to be taken, all actions necessary to consummate and make effective the Transactions as promptly as practicable after the date of this Agreement. Without limiting the generality of the foregoing, each party to this Agreement: (i) shall make all filings (if any) and give all notices (if any) required to be made and given by such party in connection with the Transactions; (ii) shall use commercially reasonable efforts to obtain each Consent (if any) required to be obtained (pursuant to any applicable Legal Requirement or Contract, or otherwise) by such party in connection with the Transactions; and (iii) shall use commercially reasonable efforts to lift any restraint, injunction or other legal bar to the Transactions.

      **4.2    Notice to Certain Persons and Cooperation.** The parties: (a) within a reasonable time following the date of this Agreement, shall provide all Persons entitled to notice of any of the Transactions prior to the closing of the Transactions with written notice of such Transactions; and (b) upon the request of the other party, shall use its reasonable efforts to obtain waivers (in a form reasonably satisfactory to the other party) executed by all Persons described in clause "(a)" of this sentence of the notice requirements described in clause "(a)" of this sentence (it being understood that waivers shall not be required from any Person with respect to whom such notice period has been complied with). The Seller will use its reasonable efforts to transfer (and cooperate with the Purchaser in any manner reasonably requested by the Purchaser to transfer) all current customer orders of the Seller to the Purchaser in a non-disruptive fashion and advise such customers to begin doing business with the Purchaser following the Closing.

      **4.3    Reserved.**

**5.    EMPLOYEE MATTERS.**

      **5.1    Responsibility for Employment Liabilities and Claims.** The Seller shall be fully responsible for any and all Liabilities and Claims arising out of or relating to: (a) the Seller's employment or termination of employment of any Seller Employee before the Closing Date provided such Employee was hired to perform services solely for Seller, and (b) the Seller Plans (collectively, the "Retained Employment Liabilities"). Retained Employment Liabilities also shall include any Liabilities and Claims relating to change in control agreements, severance payments, 280G payments and excise Taxes, sale bonuses and other retention arrangements established by the Seller provided such Liabilities and Claims arise before the Closing Date.

      **5.2    Reserved.**

      **5.3    Reserved.**

EMS_002085

**5.4 Prior Contracts.** As of the Closing, the Seller shall terminate, waive and release its rights under any covenants regarding noncompetition, non-solicitation, conflicting obligations and other similar rights under any Contracts with Seller Employees hired by any Purchaser solely to the extent necessary to allow the Purchaser to operate the Business post-Closing.

## 6. MISCELLANEOUS PROVISIONS.

**6.1 Survival of Representations, Etc.** The representations and warranties made by the Seller and the Purchaser in this Agreement shall not survive the Closing and shall thereafter terminate.

**6.2 Further Actions.** From and after the Closing Date, the Seller shall cooperate with the Purchaser and the Purchaser's Representatives and shall execute and deliver such documents and take such other actions as the Purchaser may reasonably request, for the purpose of evidencing the Transactions and putting the Purchaser in possession and control of all of the Transferred Assets. To the extent that the Seller has been unable to obtain any Consent that the Purchaser reasonably deems necessary to be obtained for the transfer to the Purchaser of any of the Transferred Assets by the Closing Date, the Parties shall use their reasonable efforts to obtain such Consent as promptly as practicable thereafter. Until such Consent is obtained, the Seller shall cooperate, and shall use its reasonable efforts to cause its Representatives to cooperate, with the Purchaser in any lawful arrangement designed to provide the Purchaser with the benefits of such Transferred Assets at no cost to the Purchaser in excess of the cost the Purchaser would have incurred (without modification to the terms of the Contract) if the Consent had been obtained. The Seller hereby irrevocably nominates, constitutes and appoints the Purchaser as the true and lawful attorney-in-fact of the Seller, solely with respect to the transfer of the Transferred Assets to Purchaser, (with full power of substitution) effective as of the Closing Date, and hereby authorizes the Purchaser, solely with respect to the transfer of the Transferred Assets to Purchaser, in the name of and on behalf of the Seller, to execute, deliver, acknowledge, certify, file and record any document, to institute and prosecute any Proceeding and to take any other action (on or at any time after the Closing Date) that the Purchaser may deem reasonably appropriate for the purpose of: (a) collecting, asserting, enforcing or perfecting any Claim, right or interest of any kind that is included in or relates to any of the Transferred Assets; (b) defending or compromising any Claim or Proceeding relating to any of the Transferred Assets; or (c) otherwise carrying out or facilitating any of the Transactions, provided, however, that Purchaser shall provide Seller with written notice of any such action within the period that is five (5) business days prior to taking such action. The power of attorney referred to in the preceding sentence is and shall be coupled with an interest and shall be irrevocable and shall survive the dissolution or insolvency of the Seller.

**6.3 Continuing Access to Information.** Following the Closing, the Seller shall make its Representatives reasonably available to the Purchaser at reasonable times to answer questions related to the Transferred Assets and the Business as conducted pre-Closing by the Seller.

**6.4 Publicity.** The Seller and the Purchaser shall ensure that after the Closing Date: (a) no press release, public statement or other publicity concerning any of the Transactions is issued or otherwise disseminated by or on behalf of the other party or any of the Representatives of the other party without the other party's prior written consent (such consent not to be unreasonably withheld or delayed); (b) the Seller and the Seller's Representatives or the Purchaser and the Purchaser' Representatives, as applicable, continue to keep the terms of this Agreement and the other Transactional Agreements strictly confidential; *provided, however*, that the existence and terms of this Agreement and the other Transactional Agreements may be disclosed to the extent required by law; and (c) the Seller and the Representatives of the Seller or the Purchaser and the Purchaser' Representatives, as applicable, keep strictly confidential, and do not use or disclose to any other Person, any non-public document or other information that relates to the Agreement, the Transactions or Transferred Assets. Except as expressly contemplated by this Agreement, each party

EMS_002086

will use all reasonable efforts to consult with the other party prior to issuing any press release or making any public statement regarding this Agreement or the Transactions.

      **6.5**    **Fees and Expenses.**  The parties shall each bear and pay their own fees, costs and expenses that have been incurred or that are in the future incurred in connection with: (i) the negotiation, preparation and review of this Agreement (including the Seller Disclosure Schedule and the Purchaser Disclosure Schedule), the other Transactional Agreements and all bills of sale, assignments, certificates and other instruments and documents delivered or to be delivered in connection with the Transactions; (ii) the preparation and submission of any filing or notice required to be made or given in connection with any of the Transactions, and the obtaining of any Consent required to be obtained in connection with any of the Transactions; and (iii) the consummation and performance of the Transactions.

      **6.6**    **Reserved.**

      **6.7**    **Notices.**  Any notice or other communication required or permitted to be delivered to any party under this Agreement shall be in writing and shall be deemed properly delivered, given and received: (a) when delivered by hand; or (b) the third business day after sent by registered mail or by courier or express delivery service, in any case to the address set forth beneath the name of such party below (or to such other address as such party shall have specified in a written notice given to the other parties hereto):

              **If to the Purchaser:**

              Endeavor Managed Systems, Inc.
              1354 N. Loop 1604 East, Suite 103
              San Antonio, Texas 78232
              Attention: Jay Bock

              with a copy delivered by email to jay.bock@endeavor-ms.com

              **If to the Seller:**

              Genesis Networks Telecom Services, LLC
              1354 N. Loop 1604 East, Suite 103
              San Antonio, Texas 78232
              Attention: James Goodman

      **6.8**    **Headings.**  The bold-faced headings contained in this Agreement are for convenience of reference only, shall not be deemed to be a part of this Agreement and shall not be referred to in connection with the construction or interpretation of this Agreement.

      **6.9**    **Counterparts and Exchanges by Electronic Transmission.**  This Agreement may be executed in separate counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one agreement.  The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission shall be sufficient to bind the parties to the terms and conditions of this Agreement.

EMS_002087

**6.10    Governing Law; Venue.**

(a)    This Agreement shall be construed in accordance with, and governed in all respects by, the internal laws of the State of Texas (without giving effect to principles of conflicts of laws).

(b)    Any Proceeding relating to this Agreement or the enforcement of any provision of this Agreement (including a Proceeding based upon intentional misrepresentation, willful misconduct or fraud) may be brought or otherwise commenced in any state or federal court located in the State of Texas. Each party to this Agreement: (i) expressly and irrevocably consents and submits to the jurisdiction of each state and federal court located in the State of Texas (and each appellate court located in the State of Texas in connection with any such Proceeding); (ii) agrees that each state and federal court located in the State of Texas shall be deemed to be a convenient forum; and (iii) agrees not to assert (by way of motion, as a defense or otherwise), in any such Proceeding commenced in any state or federal court located in the State of Texas, any claim that such party is not subject personally to the jurisdiction of such court, that such Proceeding has been brought in an inconvenient forum, that the venue of such Proceeding is improper or that this Agreement or the subject matter of this Agreement may not be enforced in or by such court.

**6.11    Successors and Assigns; Parties in Interest.**

(a)    This Agreement shall be binding upon the Seller and its successors and assigns (if any) and the Purchaser and its successors and assigns (if any).  This Agreement shall inure to the benefit of the Seller, the Purchaser, the other Indemnitees, and the respective successors and assigns (if any) of the foregoing.

(b)    Neither the Seller nor the Purchaser shall be permitted to assign any of its rights or delegate any of its obligations under this Agreement without the other party's prior written consent.

(c)    None of the provisions of this Agreement is intended to provide any rights or remedies to any Person other than the parties to this Agreement and the Indemnitees and their respective successors and assigns (if any).

**6.12    Waiver.**  No failure on the part of any Person to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of any Person in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy.  No Person shall be deemed to have waived any claim arising out of this Agreement, or any power, right, privilege or remedy under this Agreement, unless the waiver of such claim, power, right, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of such Person; and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.

**6.13    Amendments.**  This Agreement may not be amended, modified, altered or supplemented other than by means of a written instrument duly executed and delivered on behalf of the Purchaser and the Seller.

**6.14    Severability.**  In the event that any provision of this Agreement, or the application of any such provision to any Person or set of circumstances, shall be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to Persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or

EMS_002088

unenforceable, shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by law.

6.15    **Entire Agreement.**  The Transactional Agreements set forth the entire understanding of the parties relating to the subject matter thereof and supersede all prior agreements and understandings among or between any of the parties relating to the subject matter thereof.

6.16    **Disclosure Schedules.**  The Seller Disclosure Schedule and the Purchaser Disclosure Schedule shall each be arranged in separate parts corresponding to the numbered and lettered sections contained herein permitting such disclosure, and the information disclosed in any numbered or lettered part shall be deemed to relate to and to qualify only the particular representation or warranty set forth in the corresponding numbered or lettered section herein permitting such disclosure.

6.17    **Construction.**

(a)      For purposes of this Agreement, whenever the context requires:  the singular number shall include the plural, and vice versa; the masculine gender shall include the feminine and neuter genders; the feminine gender shall include the masculine and neuter genders; and the neuter gender shall include the masculine and feminine genders.

(b)      The parties hereto agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.

(c)      As used in this Agreement, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation."

(d)      Except as otherwise indicated, all references in this Agreement to "Sections," "Schedules" and "Exhibits" are intended to refer to Sections of this Agreement and Schedules and Exhibits to this Agreement.

*[Remainder of page intentionally left blank]*

EMS_002089

The parties to this Agreement have caused this Agreement to be executed and delivered as of the date first written above.

**ENDEAVOR MANAGED SYSTEMS, INC.,**
a Delaware corporation

By:

Name:

Title:


**GENESIS NETWORKS TELECOM SERVICES, LLC,**
a Texas limited liability company

By:

Name:

Title:

Page 11 of 18

The parties to this Agreement have caused this Agreement to be executed and delivered as of the date first written above.

**ENDEAVOR MANAGED SYSTEMS, INC.,**
a Delaware corporation

By:_____

Name:_____

Title:_____


**GENESIS NETWORKS TELECOM SERVICES, LLC,**
a Texas limited liability company

By:_____

Name: James Goodman_____

Title: Authorized Member, Goodman Investment_____

Holdings, LLC, Sole Member of GNTS LLC

EMS_002091

CONFIDENTIAL

**EXHIBIT A**

**CERTAIN DEFINITIONS**

For purposes of the Agreement (including this Exhibit A):

**Affiliate.** "Affiliate" means, with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person, including, without limitation, any general partner, managing member, officer, director or trustee of such Person, or any venture capital fund or registered investment company now or hereafter existing that is controlled by one or more general partners, managing members or investment advisers of, or shares the same management company or investment adviser with, such Person.

**Agreement.** "Agreement" means the Asset Purchase Agreement to which this Exhibit A is attached (including the Seller Disclosure Schedule and the Purchaser Disclosure Schedule), as it may be amended from time to time.

**Assumed Indebtedness.** "Assumed Indebtedness" means Indebtedness of Seller as of the Closing Date expressly assumed by Purchaser on and subject to the terms and conditions of this Agreement, but not to exceed $3,000,000 (and any amount in excess of $3,000,000 shall be an Excluded Liability).

**Business.** Means the business of the Seller as now being conducted and as presently proposed to be conducted.

**Business of the Purchaser.** "Business of the Purchaser" means the business of the Purchaser as now being conducted and as presently proposed to be conducted.

**Charter Documents.** "Charter Documents" means with respect to any particular entity, the certificate of incorporation and bylaws or equivalent governing documents, including all amendments thereto.

**Claim.** "Claim" means and includes all past, present and future disputes, claims, controversies, demands, rights, obligations, liabilities, actions and causes of action of every kind and nature, including: (a) any unknown, unsuspected or undisclosed claim; and (b) any claim, right or cause of action based upon any breach of any Contract.

**Code.** "Code" means the Internal Revenue Code of 1986, as amended.

**Consent.** "Consent" means any approval, consent, ratification, permission, waiver or authorization (including any Governmental Authorization).

**Contract.** "Contract" means any written, oral, implied or other agreement, contract, subcontract, lease, understanding, arrangement, instrument, note, warranty, insurance policy, benefit plan or legally binding commitment or undertaking of any nature.

**Encumbrance.** "Encumbrance" means, other than Permitted Encumbrances, any lien, pledge, hypothecation, charge, mortgage, security interest, encumbrance, equity, trust, equitable interest, claim, preference, right of possession, lease, tenancy, license, encroachment, covenant, infringement, interference, order, proxy, option, right of first refusal, preemptive right, community property interest, legend, defect, impediment, exception, reservation, limitation, impairment, imperfection of title, condition or restriction of

any nature (including any restriction on the transfer of any asset, any restriction on the receipt of any income derived from any asset, any restriction on the use of any asset and any restriction on the possession, exercise or transfer of any other attribute of ownership of any asset).

**Entity.** "Entity" means any corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, cooperative, foundation, society, political party, union, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization or entity.

**ERISA**. "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

**Excluded Liability**. "Excluded Liability" shall have the meaning set forth in Schedule 1.4(c).

**GAAP.** "GAAP" means generally accepted accounting principles in the United States.

**Governmental Authorization**. "Governmental Authorization" means any: (a) permit, license, certificate, franchise, permission, clearance, registration, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement; or (b) right under any Contract with any Governmental Body.

**Governmental Body**. "Governmental Body" means any: (a) nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; or (c) governmental or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or Entity and any court or other tribunal).

**Indebtedness.** "Indebtedness" means all indebtedness for borrowed money under the Loan Agreement and all Security Instruments as defined in the Loan Agreement between Prosperity Bank and Seller effective July 3, 2020.

**Intellectual Property**. "Intellectual Property" means algorithms, apparatus, databases, data collections, diagrams, formulae, system designs, hardware (including hardware in native design file format) inventions (whether or not patentable), know-how, logos, marks (including brand names, product names, logos, and slogans), network configurations and architectures, methods and processes (including manufacturing methods, sales methodologies and processes, user operation manuals, training methods and similar methods and processes), proprietary information, protocols, schematics, specifications, software, software code (in any form, including source code and executable or object code), subroutines, techniques, user interfaces, URLs, web sites, works of authorship and other forms of technology (whether or not embodied in any tangible form and including all tangible embodiments of the foregoing, such as instruction manuals, laboratory notebooks, prototypes, samples, studies and summaries).

**Intellectual Property Rights**. "Intellectual Property Rights" means all rights of the following types, which may exist or be created under the laws of any jurisdiction in the world: (a) rights associated with works of authorship, including exclusive exploitation rights, copyrights and moral rights; (b) trademark and trade name rights and similar rights; (c) trade secret rights; (d) patent and industrial property rights; (e) other proprietary rights in Intellectual Property; and (f) rights in or relating to registrations, renewals, extensions, combinations, divisions, and reissues of, and applications for, any of the rights referred to in clauses "(a)" through "(e)" above.

**Legal Requirement.** "Legal Requirement" means any federal, state, local, municipal, foreign or other law, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, rule, regulation, ruling or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

**Liability.** "Liability" means any debt, obligation, duty or liability of any nature (including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability), regardless of whether such debt, obligation, duty or liability would be required to be disclosed on a balance sheet prepared in accordance with GAAP and regardless of whether such debt, obligation, duty or liability is immediately due and payable.

**Material Adverse Effect.** A violation or other matter will be deemed to have a "Material Adverse Effect" on the Seller or the Purchaser (and a "Material Adverse Effect" will be deemed to have occurred) if such violation or other matter would, or would reasonably be expected to, have a material adverse effect on the financial condition, results of operations, assets or properties of the Business for any reason.

**Permitted Encumbrance.** "Permitted Encumbrance" means (a) statutory liens for taxes, assessments and other governmental charges that are not yet due and payable or that are being contested in good faith by appropriate proceedings, or that are otherwise not material; (b) statutory liens to secure obligations to landlords, lessors or renters under leases or rental agreements; (c) deposits or pledges made in connection with, or to secure payment of, workers' compensation, unemployment insurance or similar programs mandated by applicable laws; (e) statutory liens in favor of carriers, warehousemen, mechanics and materialmen, to secure claims for labor, materials or supplies and other like Encumbrances arising in the ordinary course of business; (f) any Encumbrances that may exist pursuant to any non-exclusive license to Company customers entered into in the ordinary course of business; (g) restrictions on transfer of securities imposed by applicable securities laws; and (h) any Encumbrances satisfied in full and discharged as of the Closing.

**Person.** "Person" means any individual, Entity or Governmental Body.

**Plan.** "Plan" means an "employee benefit plan" as defined in Section 3.3 of ERISA, including each employment, salary, bonus, consulting, compensation, deferred compensation, incentive compensation, stock purchase, equity, severance pay, termination pay, hospitalization, medical, insurance, supplemental unemployment benefits, profit-sharing, pension, retirement, welfare, fringe benefit or other employee benefits plan, program or agreement, whether written or unwritten and whether funded or unfunded.

**Pre-Closing Period.** "Pre-Closing Period" means the period prior to the date of this Agreement.

**Predecessor.** "Predecessor" means with respect to any entity, any Entity that has been merged with or into, that has transferred material assets or Liabilities outside the ordinary course of business to or that is otherwise a predecessor to, such entity.

**Proceeding.** "Proceeding" means any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any court or other Governmental Body or any arbitrator or arbitration panel.

**Representatives.** "Representatives" means officers, directors, employees, agents, attorneys, accountants, advisors and other representatives.

**Seller Contract**. "Seller Contract" means any Contract: (a) to which the Seller is a party; (b) by which the Seller or any of its assets is or may become bound or under which the Seller has, or may become subject to, any obligation; or (c) under which the Seller has or may acquire any right or interest.

**Seller Disclosure Schedule.** "Seller Disclosure Schedule" means the schedule (dated as of the date of the Agreement) delivered to the Purchaser on behalf of the Seller and prepared in accordance with Section 6.16 of the Agreement.

**Seller Employee.** "Seller Employee" means any Person who is or was an employee, director, consultant or independent contractor of or to the Seller (or any of its Predecessors) or becomes an employee, director, consultant or independent contractor of or to the Seller at any time during the Pre-Closing Period.

**Seller Plan.** "Seller Plan" means each Plan that is or has been sponsored, maintained, contributed to or required to be contributed to by the Seller or any ERISA Affiliate for the benefit of any Proposed Employees or with respect to which the Seller may have any liability.

**Tax**. "Tax" means any tax (including any income tax, franchise tax, service tax, capital gains tax, gross receipts tax, value-added tax, surtax, excise tax, ad valorem tax, transfer tax, stamp tax, sales tax, use tax, property tax, business tax, withholding tax or payroll tax), levy, assessment, tariff, duty (including any customs duty), deficiency or fee, and any related charge or amount (including any fine, addition, penalty or interest), imposed, assessed or collected by or under the authority of any Governmental Body or any liability or obligation to with respect to the foregoing by virtue of any Contract or otherwise.

**Tax Return**. "Tax Return" means any return (including any information return), report, statement, declaration, estimate, schedule, notice, notification, form, election, certificate or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of or compliance with any Legal Requirement relating to any Tax.

**Transactional Agreements**. "Transactional Agreements" means: (a) this Agreement; (b) the Assumption Agreement; (c) the Bill of Sale; and (d) all other bills of sale, assignments and other agreements delivered or to be delivered in connection with the Transactions.

**Transactions.** "Transactions" means: (a) the execution and delivery of the respective Transactional Agreements; and (b) all of the transactions contemplated by the respective Transactional Agreements, including, but not limited to: (i) the sale of the Transferred Assets by the Seller to the Purchaser in accordance with the Agreement; (ii) the assumption of the Assumed Liabilities by the Purchaser in accordance with the Agreement and the Assumption Agreement; and (iii) the performance by the Seller and the Purchaser of their respective obligations under the Transactional Agreements, and the exercise by the Seller and the Purchaser of their respective rights under the Transactional Agreements.

CONFIDENTIAL

## EXHIBIT B

### FORM OF BILL OF SALE AND ASSIGNMENT AGREEMENT

EMS_002096

CONFIDENTIAL

## EXHIBITS

| | | |
|---|---|---|
| Exhibit A | - | Certain Definitions |
| Exhibit B | - | Form of Bill of Sale and Assignment Agreement |

### SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) - | Certain Intellectual Property (Patents) |
| Schedule 1.1(b) - | Certain Intellectual Property (Trademarks) |
| Schedule 1.1(c) - | Certain Inventory |
| Schedule 1.1(d) - | Certain Equipment |
| Schedule 1.1(e) - | Certain Fixed Assets |
| Schedule 1.1(f) - | Contract Rights |
| Schedule 1.1(g) - | Certain Governmental Authorizations and Certifications from Standards Bodies |
| Schedule 1.1(i) - | Certain Books |
| Schedule 1.1(j) - | Excluded Assets |
| Schedule 1.3(a) - | Reserved |
| Schedule 1.4(b) - | Assumed Liabilities |
| Schedule 1.4(c)- | Excluded Liabilities |
| Schedule 1.5 - | Allocation |

*[See Attached for the Schedules and the Seller Disclosure Schedule]*

EMS_002097

Schedule 1.1(a)
Certain Intellectual Property
(Patents and Patent Applications)

None.

Schedule 1.1(b)
Certain Intellectual Property
(Other Proprietary and Intellectual Property Assets – Trademarks)

1) Enterprise Service Portal (ESP)
2) myESP Mobile Application for iOS
3) myESP Mobile Application for Android
4) Enterprise Forecast Module (ENFORM)
5) ESP Travel Calculator (Google Maps Application)
6) Microsoft Windows OEM Licensing (attached to workstations included in transaction)
7) Microsoft Office OEM Licensing (attached to workstations included in transaction)
8) Customizations to Appolis WithoutWire (see 5.8(k)(ii) for underlying base software)
9) Customizations to Microsoft CRM "VRM" (see 5.8(k)(ii) for underlying base software)
10) Custom Scribe integration workflows to integrate ESP with Microsoft Dynamics GP

EMS_002103

Schedule 1.1(c)
Certain Inventory

| Part Number | Sum of qty |
|---|---|
| 379-4794 | 10 |
| 379-4795 | 92 |
| 379-4796 | 48 |
| 4600-16-VZ1 | 18 |
| 4600-16-VZ1-PBV | 6 |
| 4600-8-VZ1 | 6 |
| 4600-8-VZ1-PBV | 14 |
| 500245-001 | 18 |
| 500373-001 | 4 |
| 500389-001 | 7 |
| 70002045 | 21 |
| 80500-0147-G30 | 47 |
| 96PSRM-A300W1U-1 | 9 |
| CSG350-2LA | 1 |
| CSG355-WLA | 2 |
| CSG365 | 5 |
| CSG365-WLA | 6 |
| CSG750 | 4 |
| CSG750-WLA | 7 |
| CSG750-WLA-4GP | 2 |
| CSG770 | 27 |
| CSG770-WLA | 3 |
| CSG770-WLA-4GP | 2 |
| FWA-1010VC1717-T | 1 |
| FWA-1010VC1718-T | 8 |
| FWA-1010VC1719-T | 17 |
| FWA-1010VC1720-T | 10 |
| FWA-1010VC1721-T | 9 |
| FWA-1010VC1722-T | 4 |
| FWA-3260A1801-T | 30 |
| FWA-3260A1802-T | 23 |
| FWA-5020U 1803-T | 13 |
| FWA5020U1803-T | 2 |
| FWA-5020U1803-T | 2 |
| FWA5070L2001U-T | 2 |
| FWA-AAL1010VC-4CA | 3 |
| FWA-AAL1010VC-8CA | 16 |
| FWA-AAL1010VCR-8CA | 68 |
| FWA-AAL101VCR-4 | 1 |
| L-1515B-4C-8E-64M-C1-V210 | 4 |
| L-1515B-4C-8E-64M-V210 | 11 |
| L-4010Y-8C-32R-256-V810 | 1 |

| | |
|---|---|
| L-5510A-14C-64R-512-8GC-4XF-V1000 | 4 |
| NCA-1515A-VZ1 | 5 |
| NCA-1515A-VZ1-PB | 66 |
| NCA-1515A-VZ1-PB16 | 1 |
| NCA-1515A-VZ4-PB16 | 7 |
| NCA-1515B-VZ1-PB | 10 |
| NCA-1515B-VZ4-PB | 66 |
| R640-36-VZ1 | 5 |
| Grand Total | 748 |

EMS_002105

Schedule 1.1(d)
Certain Equipment

| | |
|---|---|
| Warehouse Equip | ESD workbenches |
| Warehouse Equip | Used partition wall for warehouse changes |
| Warehouse Equip | Pallet rack upright replacement |
| Warehouse Equip | Vinyl Mats for Warehouse |
| Office Equip | 6TB SAS HDD for Security System |
| Warehouse Equip | Shelving Units - Marietta |
| Warehouse Equip | Warehouse Racking & Installation |
| Warehouse Equip | Warehouse Workbenches (15) |
| Warehouse Equip | Shelving Units - Marietta |
| Furniture | Office Furniture - Atlanta |
| | |

Schedule 1.1(e)
Certain Fixed Assets

| Tag # | Asset Type Group | Site | Manufacturer | Model | Serial # |
|-------|------------------|------|--------------|-------|----------|
| GN0641 | Laptop | Marietta | Dell | Inspiron 15 5510 | GL0Y9G3 |
| GN0616 | Laptop | | | | 20862392953 |
| FC71PVQ | Desktop | | | | FC71PVQ |
| GN0643 | | | | | |
| 1657606 | Laptop | San Antonio | HP | Zbook | 5CG6132ZLM |
| 128768 | Desktop | | Dell | OptiPlex 3040 | 76LFMF2 |
| 146025 | Laptop | Marietta | Dell | Latitude 5480 | JSBW0N2 |
| GN00011 | Laptop | Atlanta | Dell | Optiplex 3020 | 52B3S22 |
| GN0646 | Laptop | Remote-Missouri | HP | HP EliteBook 840 G3 | 5C672963M3 |
| 6900011 | Desktop | | Dell | Optiplex 3020 | 52B3S22 |
| OP - 124126 | | | | | |
| 1657609 | Laptop | San Antonio | HP | Zbook 15v G5 | CND9110L6Y |
| GN0713 | Laptop | | | | CNK6340FV4 |
| GN0083 | Laptop | | | | |
| 168121 | Dock | KSW - Kennesaw | Dell | Thunderbolt | unk |
| Onepath 163875 | Laptop | Marietta | Dell | Latitude 5400 | F0CWF13 |

| | | | | | |
|---|---|---|---|---|---|
| GN0647 | | | | | |
| GN0651 | | | | | |
| KSW-SHIP-05 | | | | | |
| | Laptop | Austin | Mac | MacBook Pro | CO2HC76TQ05D |
| GN0772 | Dock | SAHQ | Dell | | 0THMY8 |
| GN0772 | Laptop | SAHQ | Dell | | DV47F42 |
| GN0783 | Laptop | SAHQ | MS | Surface | 44579602553 |
| 141812 | Desktop | CHB - Chamblee | Dell | Optiplex 9020 | 48HBN02 |
| 6900467 | Desktop | KSW - Kennesaw | Dell | Optiplex 3020 | BTTS842 |
| GN0771 | Laptop | Austin | HP | Envy | 8CG1503MRK |
| GN0609 | Laptop | | | | |
| GN0615 | Laptop | | | | |
| | Desktop | Marietta | Microsoft | HP ProOne 400 G1 Aio | MXL540161L |
| OP139208 | | | Dell | OptiPlex 3040 | DF5FZC2 |
| 121318 | Desktop | | | | |
| 6900152 | Desktop | KSW - Kennesaw | Dell | OptiPlex 3020 | 1Q0GS22 |
| GN0764 | Laptop | Austin / SVP | Mac | Mac Book Pro Model A2289 | C02DC7PKP3XY |
| Chase2 | | | | | |
| OP-147549 | | | | | |
| GN0648 | Laptop | Marietta | HP | EliteBook | 5CG7314WDM |
| 165965 | Dock | KSW - Kennesaw | Dell | Thunderbolt | WDTB19 |

| | | | | | |
|---|---|---|---|---|---|
| OP-158227 | Laptop | Atlanta | Dell | Latitude 5491 | 74FMPV2 |
| 158051 | Dock | KSW - Kennesaw | Dell | Thunderbolt | CN-03V37X-L9S00-8BS-0A8V-A00 |
| 123832 | Laptop | Marietta | Dell | Latitude E5470 | 7JTHJC2 |
| GN0635 | | | | | |
| 6900028 | Desktop | KSW - Kennesaw | Dell | OptiPlex 3020 | DDPP232 |
| GN0622 | Laptop | | | | O33965293053 |
| GN0656 | Laptop | San Antonio | HP | HP EliteBook 840 G3 | 5CG6031LLR |
| 6900343 | Desktop | KSW - Kennesaw | Dell | OptiPlex 3020 | 53CGQ02 |
| 158756 | Mac Mini | KSW - Kennesaw | Mac Mini | | C07ZC224JYW0 |
| 152314 | Desktop | KSW - Kennesaw | Dell | OptiPlex 3060 | 5QCQCV2 |
| 124119 | Desktop | CHB - Chamblee | Dell | OptiPlex 3040 | F8TMMD2 |
| 128768 | Desktop | CHB - Chamblee | Dell | OptiPlex 3040 | 76LFMF2 |
| 121318 | Desktop | KSW - Kennesaw | Dell | OptiPlex 3040 | DF5FZC2 |
| 690091 | Desktop | KSW - Kennesaw | Dell | OptiPlex 3020 | 7FG6842 |
| 6900470 | Desktop | KSW - Kennesaw | Dell | OptiPlex 3020 | GRHQR12 |
| 6900465 | Desktop | FLD - Field | Dell | Optiplex 3020 | BTTL842 |
| 6900455 | Desktop | KSW - Kennesaw | Dell | Optiplex 790 | JBBS0R1 |

| 6900194 | Desktop | KSW - Kennesaw | Dell | OptiPlex 3020 | BTTR842 |
|---|---|---|---|---|---|
| 6900192 | Desktop | KSW - Kennesaw | Dell | Optiplex 3020 | BTTQ842 |
| 6900137 | Desktop | KSW - Kennesaw | Dell | Optiplex 9020 | 4P14202 |
| 6900080 | Desktop | KSW - Kennesaw | Dell | Optiplex 9020 | 31CTCZ1 |
| 6900076 | Desktop | KSW - Kennesaw | Dell | Optiplex 3010 | 1Y1JPV1 |
| 6900074 | Desktop | KSW - Kennesaw | Dell | Optiplex 3020 | 82CGQ02 |
| 6900066 | Desktop | KSW - Kennesaw | Dell | Optiplex 9020 | 31KWC21 |
| 6900061 | Desktop | KSW - Kennesaw | Dell | OptiPlex 9020 | 6B14202 |
| 6900058 | Desktop | KSW - Kennesaw | Dell | OptiPlex 3020 | DS8NQ22 |
| 6900055 | Desktop | KSW - Kennesaw | Dell | Optiplex 3020 | DTBPQ22 |
| 6900011 | Desktop | KSW - Kennesaw | Dell | Optiplex 3020 | 52B3S22 |
| | Dock | KSW - Kennesaw | Dell | Thunderbolt | TW-00J5C6-32070-92D-03AD-A06 |
| 151031 | Dock | KSW - Kennesaw | Dell | Thunderbolt | TW-09P70N-32070-915-0137-A01 |
| 120498 | Dock | KSW - Kennesaw | Dell | PRO3X | CN-0PDXXF-75941-57J-0E10-A00 |
| 153147 | Dock | SMY - Smyrna | Dell | Thunderbolt | CN-00J5C6-CMC00-894-0C2A-A06 |

| | Monitor | | Dell | | SN# ZU44H4LC204391J |
|---|---|---|---|---|---|
| | Monitor | | Dell | | SN# ZU44HLD302350R |
| | Monitor | | Dell | | SN# GRP5L |
| | Monitor | | Dell | | SN# CN-0PFR7D-74261-6AJ-18EB-A00 |
| | Monitor | | Dell | | SN# CN-0PFR7D-74261-6A7-0718-A00 |
| | Monitor | | Dell | | SN# CN-078DVT-QDC00-98R-69GB-A06 |
| | Monitor | | Dell | | SN# CN-078DVT-QDC00-98R-68YB-A06 |
| | Monitor | | Dell | | SN# CN-078DVT-QD0098R-69JB-AO6 |
| | Monitor | | Dell | | SN# CN-078DVT-69HB-A06QDC00-98R- |
| | Monitor | | Dell | | SN# CN-078DVT-QDC00-98R-6NGB-A06 |
| | Monitor | | Dell | | SN# CN-078DVT-QDCOO-98R-6NUB-A06 |
| | Monitor | | Dell | | SN# CN-078DVT-QDCOO-98R-6A3B-A06 |
| | Monitor | | Dell | | SN# CB-078DVT-QDCOO-98R-691B-A06 |

| | Monitor | | Dell | | SN# CN-078DVT-QDC00-98R-6N7B-A06 |
|---|---|---|---|---|---|
| | Monitor | | Dell | | SN# CN-0PFR7D-74261-6AE-4N7L-A06 |
| | Monitor | | Dell | | SN# CN-078DVT-QD600-993-2U3B-A06 |
| | Monitor | | Dell | | SN# CN-0PFR70-74261-6AJ-0R7B-A00 |
| | Monitor | | Dell | | SN# CN-078DVT-QDC00-993-2U4B-A06 |
| | Monitor | | Dell | | SN# CN-D78DVT-QDC00-98R-690B-A06 |
| | Laptop | | Lenovo | Lenovo Thinkpad E14 | PF3B96HJ |
| | Laptop | | Lenovo | Lenovo Thinkpad E14 | PF3B949B |
| | Laptop | | Lenovo | Lenovo Thinkpad E14 | PF3B9AW2 |
| | Laptop | | Lenovo | Lenovo Thinkpad E14 | PF3B76PZ |
| | Laptop | | Lenovo | Lenovo Thinkpad E14 | PF356KBN |
| | Laptop | | Lenovo | Lenovo Thinkpad E14 | PF3B96J3 |
| | Laptop | | Lenovo | Lenovo Thinkpad E14 | PF3B9FC3 |
| | Laptop | | Lenovo | Lenovo Thinkpad E14 | PF359KX4 |

| | Laptop | | Lenovo | Lenovo Thinkpad E14 | PF3568CM |
|---|---|---|---|---|---|
| | Laptop | | Lenovo | Lenovo Thinkpad E14 | PF3B9NAL |
| | Laptop | | Lenovo | Lenovo Thinkpad E14 | PF3B682S |
| | Laptop | | Lenovo | Lenovo Thinkpad E14 | PF3B9KUL |
| | Laptop | | Lenovo | Lenovo Thinkpad E14 | PF3B9B35 |
| | Laptop | | Lenovo | Lenovo Thinkpad E14 | PF3578D8 |
| | Laptop | | Lenovo | Lenovo Thinkpad E14 | PF3578D8 |
| | Laptop | | Lenovo | Lenovo Thinkpad E14 | PF3B6CRR |
| | Laptop | | Lenovo | Lenovo Thinkpad E14 | PF3B98Y9 |
| | Laptop | | Lenovo | Lenovo Thinkpad E14 | PF3BA79Q |
| | Laptop | | Lenovo | Lenovo Thinkpad E14 | PF3B6MMH |

| GENMAR | | | | |
|---|---|---|---|---|
| | FW | CISCO | ASA5516X | 1 |
| | CONTROLER | UBIQUITY | UDMPRO | 1 |
| | SWITCH | UBIQUITY | USW-Pro-48 | 3 |
| | AP'S | UBIQUITY | UAP-FLEX | 4 |
| | AP'S | UBIQUITY | UAP-AP-HD | 5 |
| | SECURITY CAMERAS | UBIQUITY | G3PRO | 18 |
| GENCOLO | | | | |
| | FW | CISCO ASA | 5516X | 2 |
| | CONTROLER | UBIQUITY | UDMPRO | 1 |
| | SWITCH | UBIQUITY | UniFi Switch 16XG | 2 |

EMS_002113

|  |  |  | UniFi Switch PRO 48 | 2 |
|---|---|---|---|---|
|  | SWITCH | UBIQUITY | | |
|  | UPS | UBIQUITY | SMART POWER | 1 |
|  | SAN | HP | NIMBLE | 1 |

| Name | Provisioned Space | Used Space | Host CPU | Host Mem |
|---|---|---|---|---|
| ADC-APP-RPROXY1-off | 128.19 GB | 60 GB | 0 Hz | 0 B |
| ADC-APP-UPSOURCE | 68.11 GB | 68.11 GB | 129 MHz | 7.85 GB |
| adc-fieldtechs | 68.11 GB | 68.11 GB | 103 MHz | 6.43 GB |
| agnes | 184.19 GB | 180 GB | 0 Hz | 0 B |
| arjunserver | 274.18 GB | 88.85 GB | 0 Hz | 0 B |
| ATLCLONE-ESP-APP5 | 44.08 GB | 44.08 GB | 0 Hz | 970 MB |
| ATLDC01 | 136.09 GB | 136.09 GB | 77 MHz | 16.06 GB |
| ATLDC-APP05 | 216.08 GB | 216.08 GB | 51 MHz | 16.08 GB |
| ATLDC-APP06 | 524.08 GB | 524.08 GB | 77 MHz | 24.11 GB |
| ATLDC-APP07 Server Infrastructure | 3.5 TB | 3.5 TB | 181 MHz | 32.14 GB |
| ATLDC-APP08 | 524.08 GB | 524.08 GB | 51 MHz | 24.12 GB |
| ATLDC-APP-FS01 | 716.08 GB | 716.08 GB | 337 MHz | 16.09 GB |
| ATLDC-APP-PRINT01 | 96.08 GB | 81.57 GB | 103 MHz | 15.31 GB |
| ATLDC-BI1-INF | 868.27 GB | 778.69 GB | 0 Hz | 0 B |
| ATLDCDC20 | 128.08 GB | 128.08 GB | 77 MHz | 8.06 GB |
| ATLDC-ECP-DBM2-CLONE | 48.08 GB | 48.08 GB | 77 MHz | 5.67 GB |
| ATLDC-ENFORM1 | 95.97 GB | 95.97 GB | 51 MHz | 15.96 GB |
| ATLDC-ESP-APP1 | 208.13 GB | 65.66 GB | 77 MHz | 8.07 GB |
| ATLDC-ESP-APP2 | 208.13 GB | 97.13 GB | 77 MHz | 8.07 GB |

EMS_002114

| | | | | |
|---|---|---|---|---|
| ATLDC-ESP-APP3 | 216.12 GB | 111.96 GB | 622 MHz | 16.11 GB |
| ATLDC-ESP-APP3-CLONE-INF | 216.22 GB | 70.06 GB | 0 Hz | 0 B |
| ATLDC-ESP-APP4 | 208.15 GB | 144.96 GB | 155 MHz | 8.08 GB |
| ATLDC-ESP-APP4-CLONE-INF | 208.21 GB | 126.66 GB | 0 Hz | 0 B |
| ATLDC-ESP-APP5 | 84.12 GB | 64.92 GB | 25 MHz | 3.96 GB |
| ATLDC-ESP-APP6 | 287.82 GB | 131.59 GB | 51 MHz | 8.08 GB |
| ATLDC-ESP-DBM03-CLONE | 48.08 GB | 48.08 GB | 77 MHz | 4.47 GB |
| ATLDC-ESP-DBM1 | 48.11 GB | 48.11 GB | 25 MHz | 5 GB |
| ATLDC-ESP-DBM1-CLONE | 48.08 GB | 48.08 GB | 77 MHz | 5.37 GB |
| ATLDC-ESP-DBM2 | 48.11 GB | 48.11 GB | 25 MHz | 4.64 GB |
| ATLDC-ESP-DBM3 | 48.11 GB | 48.11 GB | 25 MHz | 5.84 GB |
| ATLDC-ESP-DBZ-off | 291.35 GB | 290 GB | 0 Hz | 0 B |
| ATLDC-ESP-RPT1 | 48.12 GB | 48.12 GB | 0 Hz | 7.97 GB |
| ATLDC-ESP-RPT1-CLONE | 48.08 GB | 48.08 GB | 25 MHz | 3.99 GB |
| ATLDC-ESP-WEB1 | 216.13 GB | 179.98 GB | 129 MHz | 16.09 GB |
| atldc-esp-web1a | 84.09 GB | 84.09 GB | 25 MHz | 4.08 GB |
| ATLDC-ESP-WEB2 | 216.12 GB | 178.31 GB | 129 MHz | 16.09 GB |
| ATLDC-PBX-CallBack | 42.11 GB | 42.11 GB | 25 MHz | 2.02 GB |
| ATLDC-PBX-DNS01 | 41.11 GB | 41.11 GB | 0 Hz | 955 MB |
| ATLDC-PBX-EG | 102.08 GB | 102.08 GB | 233 MHz | 644 MB |
| ATLDC-PBX-STHQ1_2016 | 412.11 GB | 412.11 GB | 518 MHz | 12.08 GB |
| ATLDC-PBX-STTS01 | 42.11 GB | 42.11 GB | 414 MHz | 1.44 GB |
| ATLDC-PBX-STVS01 | 42.11 GB | 5.68 GB | 285 MHz | 1.51 GB |
| ATLDC-RPROXY1P | 47.93 GB | 47.93 GB | 25 MHz | 3.63 GB |

EMS_002115

| | | | | |
|---|---|---|---|---|
| ATLDC-RPROXY1P-CLONE | 47.89 GB | 47.89 GB | 25 MHz | 3.62 GB |
| ATLDC-SC-TEST | 88.08 GB | 88.08 GB | 51 MHz | 8.06 GB |
| ATLDC-SMTP01 | 17.08 GB | 17.08 GB | 0 Hz | 428 MB |
| ATLDC-TERM04 | 532.08 GB | 532.08 GB | 492 MHz | 32.13 GB |
| ATLDC-TERM05 | 532.08 GB | 532.08 GB | 77 MHz | 32.14 GB |
| ATLDC-VRMADFS01 | 84.08 GB | 84.08 GB | 129 MHz | 4.06 GB |
| ATLDC-VRMAPP01 | 216.09 GB | 216.09 GB | 25 MHz | 11.25 GB |
| ATLDC-VRMSQL-PROD | 216.09 GB | 216.09 GB | 51 MHz | 15.7 GB |
| ATLDC-WOWSQL-TEST | 652.08 GB | 652.08 GB | 129 MHz | 32.15 GB |
| ATLESP-SQL-PROD | 3.66 TB | 3.66 TB | 4.93 GHz | 128.43 GB |
| AUSDCGATCAPP01 | 4.31 TB | 2.17 TB | 0 Hz | 0 B |
| AUSDCGATCWEB01 | 2.73 TB | 2.73 TB | 622 MHz | 4.05 GB |
| Backup01 | 8.05 TB | 8.05 TB | 129 MHz | 8.06 GB |
| CLONEATL-APP-UPSOURCE | 68.08 GB | 68.08 GB | 155 MHz | 8.05 GB |
| COMP_ATLDC-ESP-APP3-off | 216.22 GB | 76.4 GB | 0 Hz | 0 B |
| DEVADFS01-off | 84.25 GB | 80.01 GB | 0 Hz | 0 B |
| DEVAPPVRM01-off | 216.25 GB | 200.01 GB | 0 Hz | 0 B |
| dmessina-server | 184.22 GB | 180.03 GB | 0 Hz | 0 B |
| ESPADFS01 | 84.19 GB | 84.19 GB | 25 MHz | 4.05 GB |
| ESPFILESERV01 | 9.09 TB | 6.17 TB | 77 MHz | 16.11 GB |
| ESPFTPHOST01 | 1.04 TB | 1.04 TB | 25 MHz | 4.06 GB |
| ESPLB01 | 18.08 GB | 18.08 GB | 77 MHz | 1.73 GB |
| ESPLB01-CLONE | 18.19 GB | 16 GB | 0 Hz | 0 B |
| ESP-PROD-01 | 208.11 GB | 70.88 GB | 1.43 GHz | 8.08 GB |

EMS_002116

| | | | | |
|---|---|---|---|---|
| ESP-PROD-02 | 336.09 GB | 238.05 GB | 1.66 GHz | 8.06 GB |
| espqa | 208.12 GB | 92.33 GB | 51 MHz | 8.07 GB |
| espqa2 | 208.11 GB | 65.87 GB | 181 MHz | 8.07 GB |
| ESP-server-template | 208.08 GB | 65.75 GB | 51 MHz | 4.72 GB |
| ESPVRMAPP01 | 216.23 GB | 216.23 GB | 25 MHz | 6.8 GB |
| GATC01-APP-ARCH | 226.08 GB | 226.08 GB | 25 MHz | 7.02 GB |
| gatc01-app-prod | 226.08 GB | 226.08 GB | 51 MHz | 9.44 GB |
| GATC02-APP-TEST | 324.09 GB | 324.09 GB | 337 MHz | 9.35 GB |
| gatc04-sql-prod | 626.08 GB | 626.08 GB | 25 MHz | 16.08 GB |
| KSWDC-PBX-CCIR1 | 228.11 GB | 228.11 GB | 622 MHz | 8.08 GB |
| KSWDC-PBX-ECC1 | 1.71 TB | 1.08 TB | 1.09 GHz | 8.08 GB |
| KSWDC-PBX-ECC2 | 878.11 GB | 878.11 GB | 855 MHz | 8.07 GB |
| KSW-PBX-STCR1 | 428.11 GB | 428.11 GB | 466 MHz | 8.07 GB |
| martin | 128.11 GB | 128.11 GB | 0 Hz | 2.01 GB |
| newchaseserver | 364.16 GB | 196.34 GB | 440 MHz | 4.05 GB |
| PowerBIGateway | 48.11 GB | 48.11 GB | 51 MHz | 8.09 GB |
| RemoteDesktopGateway | 56.09 GB | 56.09 GB | 77 MHz | 15.77 GB |
| SAHQFS01-clean | 1.41 TB | 1.02 TB | 518 MHz | 8.07 GB |
| SAHQTELMAIN001-clean | 343.08 GB | 275.42 GB | 155 MHz | 5.06 GB |
| test_newchaseserver-off | 184.22 GB | 180.03 GB | 0 Hz | 0 B |
| vCenter001 | 352.49 GB | 85.09 GB | 259 MHz | 16.08 GB |
| VCenter002 | 335.91 GB | 56.17 GB | 0 Hz | 0 B |
| WOWAPP001 | 216.57 GB | 216.57 GB | 25 MHz | 13.29 GB |

EMS_002117

| | | | | |
|---|---|---|---|---|
| xESPLB01-off | 18.19 GB | 16 GB | 0 Hz | 0 B |
| xESPLB02-off | 18.19 GB | 16 GB | 0 Hz | 0 B |
| ATLDC-SQL-PROD | | | | |
| ATLDC-GRAPH | | | | |
| ATLDC-VEEAMBK02 | | | | |
| ADCVEEAMBK02 | | | | |
| ADCESXI001 | | | | |
| ADCESXI002 | | | | |
| ADCESXI003 | | | | |
| ADC-SQL-DEV | | | | |

Schedule 1.1(f)
Contract Rights

Contracts includes all amendments, orders, purchase orders, statements or scopes of work, attachments, assignments, and any related documents.

1. Master Corporate Services Agreement for Outside Services, effective September 1 2020, by NCR Corporation ("NCR") and Genesis Networks Telecom Services, LLC ("Supplier").

2. Master Services Agreement dated as of November 1, 2017, by and between Onepath Systems, LLC d/b/a Onepath and Vonage Business Inc., as assigned from OnePath to Genesis Networks Telecom Services, LLC on April 1, 2020.

3. Professional Services Agreement dated as of March 31, 2017, by and between Onepath Systems, LLC and CoxCom, LLC, as amended, assigned to Genesis Networks Telecom Services, LLC on April 1, 2020.

4. Installation and Construction Agreement dated as of October 31, 2018, by and between Stratache, Inc. and Onepath Systems, LLC, as assigned from OnePath to Genesis Networks Telecom Services, LLC on April 1, 2020.

5. Master Agreement 96048 dated as of May 22, 2018, by and between Alliant Technologies, LLC d/b/a TenFour and Onepath, LLC, as assigned April 1, 2020 to Genesis Networks Telecom Services LLC.

6. Master Services Agreement dated as of October 11, 2019, by and between Best Buy Stores, L.P. and Onepath Systems, LLC, as assigned to Genesis Networks Telecom Services, LLC on April 1, 2020.

7. Master Services Agreement dated as of January 29, 2015, by and between EarthLink, LLC and Endeavor Telecom (a related entity to Onepath Systems, LLC), as assigned to Genesis Networks Telecom Services, LLC on April 1, 2020.

8. Master Agreement dated as of September 9, 2019, by and between Luxer Corporationand Onepath Systems, LLC as assigned to Genesis Networks Telecom Services, LLC on April 1, 2020.

9. Master Agreement dated as of June 14, 2019, by and between NetFortris AcquisitionCo., Inc. and Onepath Systems, LLC, as assigned to Genesis Networks Telecom Services, LLC on April 1, 2020.

10. Master Services Agreement dated as of November 1, 2017, by and between ORBCOMM LLC and Onepath Systems, LLC, as assigned to Genesis Networks Telecom Services, LLC on April 1, 2020.

11. Master Agreement dated as of August 26, 2019, by and between Portland Internetworks and Onepath Systems, LLC, as assigned to Genesis Networks Telecom Services, LLC on April 1, 2020.

12. Master Agreement No. 000014740 dated as of February 26, 2007, by and between Preferred Long Distance, Inc. and Endeavor Telecom, Inc. (a related entity to Onepath Systems, LLC), as assigned to Genesis Networks Telecom Services, LLC on April 1, 2020.

13. Master Installer Agreement dated as of March 1, 2019, by and between RetailNext, Inc. and Onepath Systems, LLC, as assigned to Genesis Networks Telecom Services, LLC on April 1, 2020.

14. Master Agreement No. 32423 dated as of June 23, 2016, by and between XS International, Inc. and Onepath Systems, LLC, as assigned to Genesis Networks Telecom Services, LLC on April 1, 2020.

15. Services Agreement dated as of January 11, 2010, by and between Covad Communications Company and Endeavor Telecom, Inc. (a related entity to Onepath Systems, LLC), as assigned to Genesis Networks Telecom Services, LLC on April 1, 2020.

16. Task Directive No. 30140152 dated as of November 24th, 2020 by and between Onepath Systems, LLC and Iron Bow Technologies, LLC, as assigned to Genesis Networks Telecom Services, LLC.

17. Master Agreement dated as of September 25, 2019, by and between Site Grid, LLC and Onepath Systems, LLC, as assigned to Genesis Networks Telecom Services, LLC on April 1, 2020.

18. Master Agreement dated as of November 4, 2019, by and between Complete Tablet Solutions, LTD and Onepath Systems, LLC, as assigned to Genesis Networks Telecom Services, LLC on April 1, 2020.

19. Master Agreement No. 000014797 dated as of April 1, 2008, by and between EndeavorTelecom, Inc. (a related entity to Onepath Systems, LLC) and iPass, Inc., as assigned April 1, 2020 to Genesis Networks Telecom Services LLC

20. Field Subcontract MSA v042418 by and between Johnson Controls, Inc. and Onepath Systems, LLC., as amended and assigned to Genesis Networks Telecom Services, LLC on April 1, 2020.

21. Agency Sales Agreement between Advantage Communications Group, LLC and Genesis Networks Telecom Services, LLC effective September 23, 2021.

22. Material and Services Agreement between Granite Telecommunications LLC and Genesis Networks Telecom Services, LLC effective January 19, 2022.

23. Material and Services Agreement between Conscia Danmark A/S, and Genesis Networks Telecom Services, LLC effective November 1, 2021.

24. Material and Services Agreement between Easton Telecom Services, LLC, and Genesis Networks Telecom Services, LLC effective August 3, 2020.

25. Services Agreement between PRN LLC, and Genesis Networks Telecom Services, LLC.

26. Master Agreement No. 000014809 dated as of March 26, 2008, by and between

EndeavorTelecom, Inc. (a related entity to Onepath Systems, LLC) and Interface Security Systems, LLC, as assigned on April 1, 2020 to Genesis Networks Telecom Services LLC.

27. Agreement between Genesis Networks Telecom Services, LLC and Idoc Holdings, Inc dba CheckedUp.

28. Material and Services Agreement effective June 15, 2020 by and between Georgia-Pacific Consumer Products LP and Genesis Networks Telecom Services, LLC.

29. Material and Services Agreement effective January 11, 2021 between Masergy Communications, Inc., and Genesis Networks Telecom Services, LLC.

30. Material and Services Agreement effective September 14, 2020 between U.S. TelePacific Corp. dba TPx Communications, and Genesis Networks Telecom Services, LLC.

31. Master Services Purchase Agreement by and between Zones, LLC and One Path Systems, LLC effective November 21, 2019, as assigned to Genesis Networks Telecom Services, LLC on April 1, 2020.

32. Master Services Agreement by and between Tolt, LLC, and Endeavor Telecom, Inc. (a related entity to Onepath Systems, LLC), effective April 01, 2008, as assigned on April 1, 2020 to Genesis Networks Telecom Services LLC.

33. Master Agreement effective May 8, 2008 by and between CAN Communication Services, Inc., and Endeavor Telecom, Inc. (a related entity to Onepath Systems, LLC), as assigned on April 1, 2020 to Genesis Networks Telecom Services, LLC.

34. Master Agreement effective May 1, 2009 by and between North American Telecom, Inc. dba Broadsmart, and Endeavor Telecom, Inc (a related entity to Onepath Systems, LLC), as assigned on April 1, 2020 to Genesis Networks Telecom Services, LLC.

Schedule 1.1(g)
Governmental Authorizations and Certifications

None, however other required consents will be obtained.

EMS_002122

Schedule 1.1(i)
Promotional Material, Records, Books

| Jurisdiction | Type of License |
| --- | --- |
| Alaska | Business License |
| Georgia | Low Voltage Unrestricted |
| Iowa | Contractor Registration |
| Minnesota | Technology Systems Contractor |
| Nevada | Business License |
| New Jersey | Telecom Limited Wiring Exemption |
| North Carolina | Special Restricted Fire Alarm / Low Voltage Contracting |
| Tennessee | Alarm Contracting Company - Burg |
| Texas | Alarm, Elec Access Control, and Security Consultant Company |
| Virginia | Private Security Service Business - Electronic Security Services |
| Washington | Business License |
| California | Alarm Company Qualifier |
| Florida | Alarm System Contractor II Qualifier |
| Oregon | LEA (Qualifier) |
| Illinois | Private Alarm Contractor (Qualifier) |
| District of Columbia | Electrical (Qualifier) |
| Indianapolis IN | Business License |
| Shawnee KS | Business License |
| Blue Springs MO | Business License |
| Excelsior Springs MO | Occupational License |
| Greenwood MO | Business License |
| St. Charles MO | Contractor - Outside Immed Area |
| St. Louis MO | Business License - Communication |
| Dayton OH | Alarm Business License |
| Middletown OH | Alarm Business Permit |
| Youngstown OH | General Contractor Registration |
| Nashville TN | Low Voltage |

Schedule 1.1(j)
Excluded Assets

1. Agreement No. 9697.C (formerly 20120828.015.C) Master Resale Agreement between Austin Tele-Services Partners, LP dba Genesis ATS and AT&T Services, Inc. dated September 23, 2013, as amended, and all related documents and associated liabilities, assigned to Genesis Networks Telecom Services, LLC on June 18, 2020.

2. Agreement No. 10402.C (formerly 20060720.2.C) Surplus Master Resale Agreement between Genesis Networks Telecom Services, Inc. and AT&T Services, Inc. dated July 18, 2006, as amended, and all related documents and associated liabilities.

Schedule 1.3(a)
Reserved

EMS_002125

Schedule 1.4(b)
Assumed Liabilities

All Liabilities of Seller under the Purchased Contracts that arise out of or relate to the period from and after the Closing Time.

All obligations arising out of or relating to the operation of the Business or the ownership or operation of the Purchased Assets from and after the Closing Time.

Schedule 1.4(c)
Excluded Liabilities

Notwithstanding any provision herein to the contrary, Purchaser shall not assume, succeed to, be liable for, be subject to, or be obligated for, nor shall the Purchased Assets be subject to, any Excluded Liabilities. Seller shall timely perform, satisfy, and discharge in accordance with the respective terms all Excluded Liabilities. "Excluded Liabilities" shall mean all Liabilities of Seller arising out of, relating to or otherwise in respect of the Business on or before the Closing Time and all other Indebtedness and Liabilities of Seller, other than the Assumed Liabilities, including but not limited to, the following Excluded Liabilities:

(a)     (i) Tax Liabilities of the Seller; (ii) any Liabilities of the Seller relating to indebtedness, legal services, accounting services, financial advisory services, investment banking services or other professional services performed in connection with the Transactions; or (iii) any wages or salaries or other Liabilities relating to any Seller Employee, including any Retained Employment Liabilities.

(b)     All Liabilities in respect of any products sold and/or services performed by Seller on or before the Closing Time.

(c)     All Liabilities, to the extent arising out of or otherwise exclusive to the ownership or operation by Seller of (i) the real property lease (or any condition thereon), (ii) the Business on or prior to the Closing Time, (iii) the Excluded Assets or any other real property formerly owned, operated, leased, or otherwise used by Seller.

(d)     All Liabilities arising out of, under, or in connection with contracts that are not Purchased Contracts and, with respect to Purchased Contracts, Liabilities in respect of a breach by or default of Seller accruing under such Contracts with respect to any period on or prior to the Closing Time.

(e)     All Liabilities in respect of any actual, pending, closed or threatened legal proceeding, or any claim arising out of, relating to or otherwise in respect of (i) the operation of the Business to the extent such legal proceeding or claim relates to such operation on or prior to the Closing Time including but not limited to any Liability associated with any judgment, award, writ or garnishment in AT&T Services, Inc. v. Genesis Networks Telecom Services, LLC, American Arbitration Association No. 01-20-0000-5855, and/or AT&T Services, Inc. v. Genesis Networks Telecom Services, LLC, In the District Court of Dallas County, Texas, 193 District Court, Cause No. DC-21-00837, or (ii) any Excluded Asset.

(f)     All Liabilities relating to any dispute with any client or customer of the Business existing as of the Closing Time or based upon, relating to or arising out of events, actions, or failures to act on or prior to the Closing Time.

Schedule 1.5
Allocation

As determined by the parties.

EMS_002128