February 26, 2020

**PERSONAL AND CONFIDENTIAL**
Genesis Networks Enterprises, LLC
600 North Loop 1604 East
San Antonio, TX 78232
Attn: James Goodman

RE:   Loan from Network Investments, LLC

Dear Mr. Goodman:

This letter will confirm the interest of Network Investments, LLC, a South Dakota limited liability company wholly owned by T. Denny Sanford ("Lender"), in entering into a certain loan transaction (the "Transaction") with Genesis Networks Enterprises, LLC (the "Company") as described below.

It is understood by the parties that this letter is a non-binding offer to enter into the Transaction with the Company. This letter is not, and shall not be construed as, a commitment by Lender to make the investment or provide the financial accommodations contemplated hereby. Although this letter is anticipated to lead to definitive agreements to be executed by the parties that is subject to the terms and conditions below, no binding agreement shall exist unless and until execution of the written, definitive agreements. Notwithstanding the immediately preceding sentence, the provisions regarding confidentiality contained below are binding upon the parties upon execution of the letter by both parties.

| Borrower: | Genesis Networks Enterprises, LLC (the "Borrower" or "Company") |
|---|---|
| Guarantor: | James Goodman (the "Guarantor") |
| Lender: | Network Investments, LLC |
| Loan: | $25,000,000 single advance loan (the "Loan") will be extended to the Borrower for the purpose described below on the terms and conditions set forth herein:<br>• Interest/Cost- as consideration for the Loan, the Company will pay the Lender the following amounts: (i) $2,000,000 on the date that is 90 days after the closing of the Transaction ("Initial Payment") and (ii) $400,000 each month (each a "Monthly Payment") following the date on which the Initial Payment is due until the Loan is repaid in full.<br>• Term- the Loan shall mature on the date that is 180 days after the date of closing of the Transaction (the "Maturity Date"); provided however that the Maturity Date may be extended at the election of the Borrower for a period not to exceed nine (9) months after the Maturity Date so long as on or before the date that the Loan is so extended the Borrower shall have paid to the Lender the Initial Payment and each Monthly Payment due prior thereto in |

| | |
|---|---|
| | full in immediately available funds.<br>• Payments - The entire principal balance and all accrued and unpaid amounts owing under the definitive agreements due and payable in full on the Maturity Date. |
| **Option to Acquire Stock:** | In consideration of the Loan and as a condition thereto, the Lender shall receive an option from the Company or GNI to purchase shares of common stock of GNI representing up to 10% of the outstanding capital stock of GNI on a fully diluted basis for a purchase price calculated based on an enterprise value of GNI equal to $90,000,000 (the "Option") (by way of example, if the Lender exercises the Option in full, the purchase price for 10% of the outstanding capital stock of GNI on a fully diluted basis shall be $9,000,000). The Option shall be exercisable in full or in part. The Lender shall have the right to exercise the Option (or any part thereof) at any time during the period commencing on the date of the closing of the transactions contemplated hereby and ending on the second anniversary of the closing date. |
| **Security:** | The Loan will be secured by a first-priority perfected security interest in all of the tangible and intangible assets of the Borrower and the Guarantor, whether now owned or hereafter acquired (including, without limitation, (a) a collateral assignment of the Bonds (defined below) to the extent they remain outstanding and the Purchased Equity (defined below), (b) a pledge of all of the issued and outstanding capital stock or equity interests in and to each subsidiary of the Company and (c) a collateral assignment of the GNI Purchase Option (defined below) in form and substance acceptable to the Lender. The Guarantor shall absolutely and unconditionally guarantee the Loan pursuant to a guaranty in form and substance acceptable to Lender. The Guarantor shall pledge 100% of his stock or membership interests in and to GNI, the Company and each other subsidiary of the Guarantor, whether now owned or hereafter acquired. Further, the Guarantor shall agree to provide non-competition non- solicitation agreements for Lender's benefit in the event that Lender exercises any of its remedies against the Borrower, Guarantor, or any of their respective assets from and after any default or event of default, and in such instance, the Guarantor will agree to provide Lender with his full cooperation. |
| **Purpose:** | Proceeds under the Loan will be used solely by the Company to acquire newly issued preferred equity (the "Purchased Equity") of Goodman Networks Incorporated ("GNI"), which Purchased Equity shall, as a condition to the Lender's willingness to make the Loan, be subject to mandatory early redemption by GNI upon the sale by GNI of any capital asset(s) or line of business equal to or greater than $5,000,000 (a "Redemption Event"). GNI shall use the proceeds of the issuance of the Purchased Equity to the Company to repurchase or redeem (a) those certain senior secured notes under Symbol |

| | |
|---|---|
| | GGHI4505335 and CUSIP 38339HAF2 (the "Bonds") issued by Goodman Networks Incorporated ("GNI"), and (b) any Series A-1 preferred stock or common stock of GNI held by the holders of the Bonds. |
| **Conditions Precedent:** | Usual and customary conditions precedent to the making of the Loan for facilities of this type, including but not limited to:<br><br>(i) Duly executed copies of all definitive agreements and documents relating to the purchase of the Bonds and the Purchased Equity, in form and substance acceptable to the Lender (collectively, the "Acquisition Agreement").<br><br>(ii) The Company shall have acquired an option to purchase shares of common stock of GNI at fair market value sufficient in amount that, when taken together with the Purchased Equity owned by the Company, the Company would own at least 51% of the outstanding capital stock of GNI on a fully diluted basis after giving effect to the exercise of such option (the "GNI Purchase Option"). The GNI Purchase Option shall be exercisable upon the first to occur of (i) December 31, 2020 or (ii) the date that a default or event of default occurs under the definitive documentation governing the Loan. To the extent the GNI Purchase Option remains unexercised at the time the Loan and all other amounts owing to the Lender are repaid in full, the GNI Purchase Option shall expire. The GNI Purchase Option shall be in form and substance acceptable to the Lender.<br><br>(iii) A binding loan commitment from East West Bank (the "Bank"), in form and substance acceptable to the Lender, pursuant to which the Bank will provide a loan to GNI, the proceeds of which will be used in part to purchase Bonds, Preferred Equity or Common Stock currently outstanding at GNI.<br><br>(iv) Satisfactory review by the Lender of all agreements between the Company and GNI regarding the purchase of the Purchased Equity, the GNI Purchase Option and the transactions contemplated thereby or in connection therewith.<br><br>(v) Completion of due diligence with respect to the Borrower, Guarantor and GNI, which shall be satisfactory to Lender in its sole discretion.<br><br>(vi) The negotiation of loan and security documents |

| | |
|---|---|
| | satisfactory to the Lender. Receipt of other customary closing documentation, including the legal opinion of counsel to the Borrower and Guarantor, an officer's closing certificate and an officer's solvency celiificate, each reasonably acceptable to the Lender.<br>(vii) Perfection of liens on collateral.<br>(viii) The representations and warranties in the Acquisition Agreement shall be true and correct in all material as of the closing date of the acquisition of the Bonds, the Purchased Equity and the GNI Purchase Option.<br>The Acquisition Agreement and the transactions contemplated thereby shall have been approved by the Borrower's directors and (if necessary) shareholders, and all necessary legal and regulatory approvals with respect to the Acquisition Agreement shall have been obtained. There shall be no injunction, temporary restraining order, or other legal action in effect which would prohibit the closing of the Acquisition Agreement or the closing and funding of the Loan. |
| **Reps & Warranties:** | Usual and customary representations and warranties for facilities of this type, including but not limited to: existence, qualification and power, authorization, no contravention, consents, binding effect, financial statements, no material adverse effect, solvency, litigation, no default, ownership of property, liens, environmental compliance, insurance and casualty, taxes, ERISA compliance, subsidiaries, equity interests, capitalization, margin regulations, Investment Company Act, disclosure, compliance with laws (including anti-terrorism laws and foreign assets control regulations), labor matters, brokers, closing date documents, indebtedness and customary representations and warranties regarding collateral. |
| **Other Covenants:** | Usual and customary covenants for facilities of this type including but not limited to:<br><br>• Affirmative and operational covenants: Borrower shall use 50% of the proceeds of each Redemption Event to repay the Loan (and all accrued amounts owing thereunder), payment of obligations, preservation of existence, maintenance of properties, maintenance of insurance, compliance with laws generally, environmental laws, books and records, inspection rights, meetings with Lender, ERISA, further assurances, and customary covenants regarding collateral, including obtaining bank account collateral agreements in favor of Lender.<br><br>• Restrictive covenants: subject to customary exceptions acceptable to the Lender in its sole discretion, no additional indebtedness, liens, investments, mergers and dissolutions, |

| | |
|---|---|
| | dispositions, restricted payments, material change in nature of business, transactions with affiliates, other than the following GDMN-2, People NQ, People LLC, Jake LLC, MBE LP, Genesis Networks Enterprises, LLC, James and John Goodman (which transactions shall be satisfactory to Lender in its sole discretion), inconsistent agreements, use of proceeds, prepayment of indebtedness, amendment to material agreements, anti-terrorism laws and foreign asset control regulations, fiscal year, Borrower's activities and customary covenants regarding collateral. |
| **Events of Default:** | Usual and customary for facilities of this type, including but not limited to: unless cured within the allowed time, failure to pay any interest, principal, fees or other amounts when due, default under any covenant or agreement in any loan document, inaccurate or false representations or warranties, cross default with other debt agreements, bankruptcy, insolvency, unsatisfied judgments ERISA, any loan document is repudiated or is no longer in force and effect, cessation of business, and change of control. |
| **Expenses:** | Borrower shall pay all reasonable and documented out-of-pocket expenses incurred by Lender in connection with documentation of the proposed Transaction, including without limitation the reasonable fees, charges and disbursements of (1) outside counsel for Lender and (2) outside consultants for Lender. Borrower shall also pay all reasonable and documented out-of-pocket expenses (including any extraordinary expenses following a default, event of default, or insolvency event) in connection with (1) the preparation, negotiation, administration, execution and delivery of any amendments, modifications or waivers of the provisions of the definitive documents governing the Transaction, or<br><br>(2) the enforcement or protection of Lender's rights in connection with the documentation or reasonable efforts to preserve, protect, collect, or enforce the collateral. |
| **Indemnification** | The Lender will be indemnified against all losses, liabilities, claims, damages and expenses relating to or arising out of the loan documents, the transactions contemplated hereby or the Borrower's use of Loan proceeds, including without limitation environmental problems, such indemnity to include without limitation reasonable attorneys' fees and settlement costs, other than any such losses, liabilities, claims; damages or expenses arising out of the gross negligence or willful misconduct of the Lender. |
| **Governing Law and Venue:** | South Dakota |
| **Due Diligence:** | Within 30 business days after the execution of this letter of intent, Lender, through its representatives, will conduct a due diligence examination of the Company and the Guarantor. If, as a result of |

CONFIDENTIAL INFORMATION

| | |
|---|---|
| | said examination, Lender determines that the financial condition or prospects of the Company and Guarantor are not acceptable to Lender in its sole discretion, then Lender shall have the option to cease discussions regarding the proposed Transaction with no liability whatsoever.<br><br>Otherwise, if the financial condition and prospects are acceptable to Lender and the parties are in agreement to proceed with the Transaction, then the parties will prepare, negotiate and execute definitive agreements reflecting the terms set forth in this letter of intent. |
| **Confidentiality:** | No party will make any public announcement concerning these discussions or the potential transaction prior to execution and delivery of the definitive agreements. Further, the Company, the Guarantor and Lender agree that the terms, conditions and existence of this letter of intent will be treated as confidential and, except with the prior consent of the other party, not disclosed in any manner whatsoever, directly or indirectly in whole or in part to any third party except to management officials or agents of either party who are assisting in the Transaction (all of whom shall keep as confidential the terms, conditions and existence of this letter of intent). |

Although Lender intends in good faith to carry out the transactions described in this letter, no binding legal agreement will arise (except pursuant to the sections above entitled "Confidentiality") until the definitive agreements described above have been prepared and executed by the appropriate parties.

If this proposal is acceptable, please have an authorized representative of the Company sign where indicated below.

Very truly yours,

NETWORK INVESTMENTS, LLC

By _____
Its MANAGER

The foregoing is understood, accepted and agreed to as of the date set forth below.

Dated: 2-26-20

GENESIS NETWORKS ENTERPRISES, LLC

By James Goodman
Its _____

12371944v8

CONFIDENTIAL INFORMATION

JONATHAN G. 000373